**EDWARD P. PAUL & CO., Inc. v. FEDER-
AL TRADE COMMISSION.**

No. 9457.

United States Court of Appeals
District of Columbia.

Argued Dec. 2, 1947.

Decided May 10, 1948.

CLARK, Associate Justice, dissenting.

Mr. Nathan L. Silberberg, of Washington, D. C., for petitioner.

Mr. Donovan R. Divet, Sp. Atty., Federal Trade Commission, of Washington, D. C., with whom Mr. William T. Kelley, Gen. Counsel, Federal Trade Commission, and Mr. Walter B. Wooden, Associate Gen. Counsel, Federal Trade Commission, both of Washington, D. C., were on the brief, for respondent.

Before STEPHENS, Chief Justice, and CLARK and PRETTYMAN, Associate Justices.

PRETTYMAN, Associate Justice.

Petitioner is an importer and manufacturer of porcelain products sold by it principally to retail stores. It publishes and distributes from time to time to some 25,000 retailers a catalog. Among other items in this catalog was a "line" of table lamps, cigarette boxes, ash trays and candy boxes concerning which the following expressions were used as descriptive: "Imported 'Du Barry' Procelain", "IMPORTED Hand Decorated 'Du Barry' Porcelain", and " 'DU BARRY' Porcelain Table Lamps are nationally famous as reproductions of rare original French and English 'old pieces' ". The respondent Commission issued a complaint, the burden of which was that by the advertising the petitioner represented and implied, and purchasers were led to believe, that the products were of British or French origin; that the representations were false, deceptive and mis-

leading, in that the porcelain part of the products was made in Japan. After extended hearings, the Commission issued an order in which it required petitioner to cease and desist from using the legend "Imported—Du Barry" or any other legend or words indicative of French origin, to designate or describe products made in whole or in substantial part in Japan, without clearly disclosing the Japanese origin, and from representing in any manner that products made in whole or in substantial part in Japan are of French or British origin. This petition is for review of that order.

■ Petitioner's first point is that the Commission has exceeded its jurisdiction, because the order aims to prevent the company's use of its trademark, the word "Du Barry." The order does not purport to interfere with the use of the trademark. It merely directs that the company not represent to the public that products made in Japan are imported from elsewhere. The advertising above quoted was not a mere unadorned use of the word "Du Barry". It was an affirmative representation as to the nature of the product. There was substantial testimony that the advertising conveyed to both retailers and consumers the impression that the porcelain was of French origin. A reading of the advertisement and an observation of the products presented as exhibits lead one to conclude that this testimony was reasonable and neither strained nor improbable. A lamp, for example, is advertised as "imported 'Du Barry' porcelain, reproduction of rare original French piece," when as a matter of fact it consists of a piece of Japanese porcelain set in a metal base manufactured in this country. It is unnecessary to cite authority that in this posture of the case the court cannot disturb the findings.

The company says that the advertisement could not be misleading, because of the very low price at which the product is sold. It says that any purchaser would know that porcelain imported from France could not be sold at these low prices. But that argument cuts both ways. Its basic assumption is that porcelain imported from France is of much greater value than that made elsewhere, so much so that any purchaser would know that fact. Thus, the premise is an admission that the words of the advertisement are misleading, and the ensuing contention is that the natural implication of the words is offset by the price. In substance, the argument is that a seller has a right to envelop a cheap article in an admittedly misleading aura of value so long as the price remains low. The answer is that the order of the Commission is merely that the terms which are misleading be eliminated. The Commission is not penalizing the company or ordering it to cease doing any business whatever. It merely directs that representations, admitted by this particular argument to be in themselves deceptive, be not used in the public distribution of the product. We have no doubt of its power and duty to do so.

■ Petitioner next contends that the Commission failed to observe the requirement of the Act that a notice of hearing, giving a date and place fixed, must be given. It says that the Act further requires that the corporation complained of shall have the right to appear at the place and time so fixed and "show cause" why an order should not be entered by the Commission.[1] The facts are that this company was given a notice of the time and place of the hearing before an examiner; that before the date thus fixed it was notified formally and in writing that another date, of which it would be duly notified, would be fixed; that by an order of November 22, 1944, the date at which the taking of testimony would begin was fixed as November 30, 1944; that on November 30th counsel for the company announced "The respondent is ready", making no objection as to lack of notice or of opportunity to prepare; that thereafter extended hearings on notice were held, in the course of which continuances were had from time to time, the dates for reconvening being announced in advance on the record, and without objection; that the petitioner, by counsel, participated in all the hearings; that counsel for the Commission first placed in the record the evidence which its staff

---

[1] 38 Stat. 719 (1914), 52 Stat. 111 (1938), 15 U.S.C.A. § 45 (1941).

had gathered in support of the complaint; that thereafter the company was afforded ample opportunity to present such evidence as it desired to present; that an examiner's report was filed; and that thereafter a hearing was had before the Commission upon that report and the exceptions to it. Petitioner's contention seems to be that under the Act it was entitled, as a matter of right, to show cause why an order should not be entered, before testimony in support of the complaint was placed in the record, and also that the various continuances of the hearing violated the company's rights. The premises for these contentions are not clear in the brief. There it is said that "The time mentioned in the complaint was wholly superficial" and "There was no show-cause hearing then or at any other time." We perceive no substance in the contentions thus stated.

■ Petitioner's next point is that its motion to quash the examiner's report should have been granted, because, it says, Commission Rule XX (July 1, 1944) required the examiner to submit his report 15 days after the close of testimony, and this examiner made his report 164 days after the hearing ended. It is sufficient to note that the Commission's rule is not as petitioner says. Rule XX of the Commission's Rules of Practice (July 1, 1944) requires that the examiner shall, within 15 days "after receipt by him of the complete stenographic transcript of all testimony in a proceeding," file his report. There is nothing in this record to show when the examiner received the transcript. Hence there is no factual basis upon which petitioner's contention can rest.[2]

■ Petitioner says that the order is void because it is too vague to be followed.

It says that it cannot determine with precision when a product may be made "in substantial part" in Japan. It points to articles of which the part most striking upon observation may be the porcelain but of which the more costly parts may be the metal base or other parts added in this country, or elsewhere than in Japan. It says that it has no yardstick by which to determine what is meant by "in substantial part" of Japanese origin. The answer to this contention is that the order of the Commission merely requires the company to represent accurately, or else not to represent at all, the place of origin of its products. If the porcelain portion of a product is made in Japan and the other parts are made in the United States or elsewhere, a simple indication of that fact in the catalog would satisfy the Commission's order. The company says that its advertisements have not been misleading, and it thereby indicates a desire not to mislead. If that be so, it should have no objection to making its advertisements clear. If it has no desire to conceal the fact that the porcelain portion of these products is made in Japan, it could have no possible objection to so stating in its advertisements. The term "in substantial part" becomes vague only when one attempts to come as close to the line of misrepresentation as the Commission will permit. We find nothing objectionable in the use of the term in the order. The company can avoid difficulty with it by merely being accurately true in its advertisements.

The order of the Commission will be affirmed and the petitioner company directed to obey the terms of that order.[3]

Affirmed.

---

[2] Neither petitioner's brief nor the printed joint appendix shows the date when the actual hearings ended, except for petitioner's statement that "Here the Examiner made his report 164 days after the hearing ended." That report was dated September 17, 1945. The last date appearing in the original record (not printed) as a day of taking testimony is April 5, 1945. That record contains a formal order of the Examiner, dated August 10, 1945, "closing taking of testimony". Prior to that latter date the Rules of the Commission had been amended, and the Rules promulgated July 1, 945, required the Examiner to file his report "not later than thirty (30) days after receipt by him of the complete stenographic transcript of all testimony and all exhibits in the proceeding".

[3] Federal Trade Commission Act, § 5 (c), 38 Stat. 719 (1914), as amended, 52 Stat. 113 (1938), 15 U.S.C.A. § 45(c) (1941).

CLARK, Associate Justice (dissenting).

I find myself completely unable to agree with the decision of the court in this case. I believe the finding of the Federal Trade Commission to be not only arbitrary and capricious in the extreme but also absurd and ridiculous.

The facts are very simple. Petitioner, Paul, had for many years manufactured and sold a line of so-called "art objects", i. e., lamps, porcelain and art ware, using as a trade name the name "Du Barry." Some of the material for this line of goods came from Italy, some from Czecho-Slovakia, some from Hungary, some from Yugoslavia, some from Japan. This importing practice had prevailed for many years.

The gist of the present action by the Commission is that an insertion was made in a catalogue intended to be and actually circulated to *retailers* only, and not to the general public, which described this line of goods as "Imported Du Barry", and further stated that it consisted of *copies* of well-known French and British specimens of the same class. Now, mark well, there is not a scintilla of evidence in the whole record concocted by the Commission that contradicts in the slightest degree the statements in the catalogue. Not one single word denies (1) that the articles were imported, (2) that they were marketed under a well recognized trade name "Du Barry," (3) that they were copies of well-recognized French and English masterpieces.

None of these facts were disputed. Moreover there was not one witness to testify that he or she had been misled into purchasing any of this line by any statement in the catalogue circulated to dealers. The proceeding was instituted on the complaint of a disgruntled retailer who had had several quarrels with petitioner on account of her singular reluctance, not to say resistance, toward paying her bills. The chief witness was the merchandise manager of a department store who neither bought nor sold goods, and was, moreover, embittered by the refusal of petitioner to give him an exclusive contract for the sale of goods. The so-called "public" witnesses, selected by the Commission, which was trying the case, were simply called in off the street and asked a hypothetical question which left out one of the most vital issues in the case—the question of the price at which the imported articles were sold. To be sure there was also the testimony of a man who qualified as an expert, on the basis of six weeks experience in the business, that some one might be misled, although he knew of no one who ever had been so misled.

It is on the basis of such testimony as this that the Commission arrives at the momentous conclusion that the term "Imported Du Barry" indicates origin from either France or *Great Britain*. Conceding the expertness of the Commission on such matters it is nevertheless incumbent on this court to check the bases of the Commission's opinion.

If, for instance, there is anything in the name Du Barry to make it a national trade mark for France or Great Britain there is no finding of fact made by the Federal Trade Commission to justify this, nor is there any justification in history so far as is known. If the specialists of the Federal Trade Commission have such evidence they were notably negligent in producing it in the trial of this case, and it is remarkable chiefly from its entire absence in the opinion and decision in the case.

To be sure, in the middle of the 18th century, a nameless waif, the illegitimate daughter of a poor washerwoman in Vaucouleurs, France, became a successful courtesan under the name of Mlle. Lange. Her great charm brought her under the protection of Jean, Comte du Barry, who used her as a decoy in his gambling house. Finding her very successful in this regard, he succeeded by devious means in introducing her to the notice of the King, who was captivated by her, with the result that she became his mistress. Since court etiquette forbade her introduction at court without a title and since Comte Jean was married and divorce was impracticable under French law at that time, Jean's brother Guillaume married the lady. Which of the three, the King's light of love, the erstwhile "protector", Comte Jean, or his brother, the complaisant husband, has been adopted by the Commission as a perpetual and national trade mark for both France

and Great Britain does not clearly appear from the Commission's conclusion.

So far as history records the only connection that any one of them ever had with the unfortunate British to whom the Federal Trade Commission now attaches them is the final trip which Madame Du Barry made to England to try to sell her jewels, the ill-gotten gains from her affair with King Louis XV, for which she was beheaded in the French Revolution.